TRUSTEES OF SERIES Q, GROUP CERTIFICATES OF NEW YORK TITLE AND MORTGAGE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

TRUSTEES OF SERIES F–1, GROUP CERTIFICATES OF NEW YORK TITLE AND MORTGAGE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

TRUSTEES OF SERIES F–1, GROUP CERTIFICATES OF NEW YORK TITLE AND MORTGAGE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 111983, 111984, 111985. Promulgated November 17, 1943.

*Joseph B. Miller, Esq.*, for the petitioners.
*Conway N. Kitchen, Esq.*, for the respondent.

992

994

OPINION.

Sternhagen. *Judge*: 1. The Commissioner determined that each of the petitioners was "a strict trust," taxable upon "the portion of the income which was not distributed to the Beneficiaries." The petitioners contest this, and each contends that it is in the nature of a receiver of a part of the assets of an insolvent corporation and therefore not taxable. This is their first and main point, the other points being stated in the alternative in the event that petitioners are held to be taxable entities. The respondent does not argue the question whether petitioners are receivers, but, upon the assumption that they are "strict trusts," argues the question whether petitioners are properly taxable upon the undistributed net income.

It is true that the trustee of each series received only "a part of the assets of an insolvent corporation," the Title Co. The Title Co. had issued certificates in excess of $700,000,000 against mortgages. Series Q had certificates outstanding in the face amount of $10,205,307.08 and series F-1 had $27,463,985.28 of certificates outstanding, and the trustees of each series received only such mortgages and other assets as were in the series portfolio. Prior to the transfers to the trusts the Title Co. was the "owner" of the mortgages and other portfolio assets. However, such ownership was "subject to the collateral lien of the certificate holders." *Weil* v. *President and Directors of Manhattan Co.*, 9 N. E. (2d) 850, 851; *Prudential Ins. Co.* v. *Liberdar Holding Corporation*, 72 F. (2d) 395, 396. The relation between the Title Co. and the certificate holders was that of debtor and creditor (*In re New*

*York Title & Mortgage Co.*, 23 N. Y. S. (2d) 303), the Title Co. being "the primary debtor, assigning the mortgages only as collateral security for the debt." *People* v. *Title & Mortgage Gurantee Co.*, 264 N. Y. 69; 190 N. E. 153, 159. In other words, the certificate holders were secured creditors or claimants of the Title Co. *In re New York Title & Mortgage Co.*, 289 N. Y. S. 771; *In re New York Title & Mortgage Co.*, 11 N. Y. S. (2d) 828, 832.

The Superintendent of Insurance of New York became the statutory receiver of the Title Co. *People* v. *Title & Mortgage Guarantee Co., supra; Pink* v. *Title Guarantee & Trust Co.*, 8 N. E. (2d) 321; *In re Morgan*, 14 N. E. (2d) 39; *In re Lawyers Mortgage Co.*, 31 N. E. (2d) 492, 494; *In re Kinney*, 14 N. Y. S. (2d) 11; affd., 24 N. E. (2d) 494. As such, he segregated the collateral security of the several series portfolios. Each certificate holder was entitled to share equally in the proceeds from the assets in the portfolio of his particular series. As a lien holder he had the right to have the collateral subject to his lien reduced to his possession or applied upon his claim. If there had been but one or a few certificate holders, instead of 3,000 to 5,000, an assignment by the Superintendent of Insurance of the collateral would have been practical.

However, concerted action by the large number of certificate holders involved in series Q and series F-1 and many others was not obtainable. The existing remedies of the certificate holders, and particularly of the large groups, were inadequate. *In re Lawyers Westchester Mortgage & Title Co.*, 41 N. E. (2d) 449, 453. This was recognized by the Legislature of New York and it was declared in the Schackno Act, chapter 745, Laws of 1933:

to be essential for the public interest to provide a procedure under which such bonds, mortgages or other security may be liquidated in an orderly manner and under which the assets of the guaranty corporations may be administered and conserved equally and ratably in the interests of holders of mortgage investments.

The Superintendent of Insurance of New York was not sufficiently equipped to administer the collateral security consisting of thousands of mortgages and parcels of realty. Certificate holders objected on the ground that he represented other and conflicting interests.

As a means of adequately protecting the rights of groups of certificate holders, a trust was devised, primarily at the instance of the Superintendent, as an entity which could take possession and efficiently administer and liquidate the assets in the portfolio of each series and which would represent and act in the interests of the certificate holders. As representative of the certificate holders, the trustees were authorized "to enforce the common claims of the holders of the contracts of guaranty against the obligor," the Title Co. *In re Lawyers Westchester Mortgage & Title Co., supra.* They were not

required to account to the Superintendent of Insurance or to the Title Co. All they acquired, less expenses, was distributable to the certificate holders. After the mortgages and other assets had been transferred to the trustees. the Title Co. was no longer the owner of such assets and the trustees did not hold them as "part of the property" of the Title Co. They held them as technical owners for the benefit of the certificate holders. Had there been but one certificate holder and the assets underlying his certificate had been transferred to him to be applied upon the obligation of his debtor, there could have been no question of a partial receivership or part ownership of all the debtor's property. Such holder would have been subject to income taxes upon the income thereafter received from the assets which he held. We are of opinion that the trusts are entities separate and distinct from the Superintendent of Insurance as statutory receiver and from the Title Co., and that they are taxable trusts under section 161, Revenue Acts of 1934 and 1936. They were not in the nature of receivers of the series Q and series F-1 assets. Such assets had been entirely separated from the receivership. There was no subordinate relation between the trustees and the Superintendent, who alone was the statutory receiver of the Title Co.'s assets. Petitioners were not receivers of part of the Title Co.'s property.

The trustees were not paying the obligations of the Title Co., as contended by petitioners. The obligation of the Title Co. to holders of series Q and series F-1 certificates was paid *pro tanto* when the assets were transferred to the trusts. Thereafter the Title Co. was liable only upon its guaranty for any deficiency. The trustees were distributing the net amount of income or proceeds of the trusts, above expenses, to the certificate holders, who were entitled thereto as beneficiaries of the trust. Prior to the creation of the trusts the certificate holders had a right of lien; thereafter they became the equitable owners of the trust assets and the net income. There was no constructive receipt by the Title Co. as in *Blumenthal* v. *Helvering*, 296 U. S. 552, and *Douglas* v. *Willcuts*, 296 U. S. 1.

2. The petitioners contend that if they be held to be trusts, as the Commissioner has determined, they are nevertheless not properly taxable upon the income of the trusts because the trusts are revocable and the income is therefore taxable to the certificate holders as grantors (sec. 166), and also because the income may within the discretion of the grantor, be held or accumulated for him (sec. 167). This is based upon the proposition that the certificate holders are the grantors. The Commissioner's counsel in argument concedes this proposition, but it is a proposition of law we are unable to adopt. The trusts were set up under the Schackno Act, not as a private transfer of property

by the owners, but as a means prescribed by the legislature for alleviating the economic disaster. The transfer was by the Superintendent of Insurance, the statutory receiver, and not by the Title Co. or the certificate holders. The consent given by the certificate holders did not make them grantors within the contemplation of section 166 or 167. Those sections were to check tax avoidance by taxpayers setting up private trusts while retaining substantial control, a field not touched upon by the present trusts. Mertens, Law of Federal Income Taxation, vol. 6, § 37.01. Even if these trusts were literally within the provisions of sections 166 and 167, they would clearly not be within their intendment. The question is also suggested whether the State Supreme Court, under whose direction and control the trusts are administered, has an interest in the trusts but not a substantial interest adverse to the grantor. We think there is no ground for the suggestion, since the Court can not be regarded as having any interest whatever in the trusts. Its function and relation to the trusts is entirely judicial, and to treat it as having a substantial interest in them is to misconceive its nature. We think sections 166 and 167 are entirely inapplicable to the petitioners and do not require that the tax upon the undistributed trust income be levied against the certificate holders or the Title Co. as grantors.

3. The trustees contend that the undistributed income is not taxable to them, but to the certificate holders, under sections 161 (a) (2) and 162 (b), 1934 and 1936 Acts, for the reason that it was distributable "periodically." Under section 161 (a) (2) income "which is to be distributed currently   *   *   *   to the beneficiaries" is included in the gross income of the trust and under section 162 (b) it is allowed as a deduction to the trust and is included in the net income of the beneficiaries "whether distributed to them or not."

Series F-1 Trust agreement authorizes the distribution of "all income collected and moneys derived from the liquidation of the Trust Estate   *   *   *   after the deduction of expenses and such sums as the Trustees deem necessary as reserves" for certain enumerated items, "the income distributable   *   *   *   to be paid over to the Certificate Holders semiannually beginning June 30, 1935." Series Q Trust agreement authorizes the trustees to pay 4 percent interest per annum semiannually, any income in excess of 4 percent to be distributed in reduction of the face amount of the certificates, provided, however, "that if sufficient funds shall not be available for the payment of any such installment of interest, the Trustees shall apply all funds available therefor to a *pro rata* payment on account of such interest installment." The funds available for that purpose were determinable by the trustees on each 15th of December and June by deducting from gross income theretofore collected (a) all expenses,

(b) interest theretofore paid to certificate holders, and (c) a reserve for the administration of the trust for the subsequent six months "in an amount to be estimated and determined by the Trustees in their discretion." In the year ended October 31, 1936, Series Q Trust distributed less than 2 percent of the face amount of outstanding certificates. Under the terms of the trust agreements the beneficiaries were entitled to only the net income determined by the trustees. Where the trust instrument requires the trustee to pay expenses and set up reserves out of trust income, the beneficiary is taxable only upon the net amount actually distributed to him. *Bessie B. Hopkinson*, 42 B. T. A. 580; affd., 126 Fed. (2d) 406; *Commissioner v. Stearns*, 65 Fed. (2d) 371; *Plimpton v. Commissioner*, 135 Fed. (2d) 482. In the *Plimpton* case the court said:

The scheme of the statute is to allow deductions to a fiduciary as to income which he is under an absolute obligation to pay to a beneficiary, whether he has in fact done so or not, and to tax such income to the beneficiary, but, by a similar technique of deduction, not to tax income to a beneficiary which he is not entitled to receive as of right until such income has been actually received.

Since the certificate holders had a right to only the distribution of the balance of the income after deduction of expenses and reserves, the undistributed income. representing reserves for taxes, maintenance, and other expenses, is not deductible by the trusts as income currently distributable to the beneficiaries.

4 (a). The petitioners contend that they are entitled under section 121 of the Revenue Act of 1942 to the deduction of the attorney and accounting fees, assignment fees, and stationery and printing expense stated in the findings. The Commissioner disallowed the deductions upon the ground that the amounts were not ordinary and necessary business expenses within the meaning of section 23 of the 1934 and 1936 Acts, prior to its amendment by section 121 of the 1942 Act. The respondent argues that such expenses were in the nature of capital expenditures and therefore not deductible. In *Walter S. Heller*, 2 T. C. 371, 374. it was said that, "It is obvious * * * that Congress intended [in the 1942 Act] that some expenditures pertaining to assets of a purely capital nature were to be allowed as deductions from gross income." Therein the deduction of attorney fees, paid for services rendered in a proceeding requiring a corporation, merging or consolidating with another, to pay dissenting shareholders, including the taxpayer, the fair market value of their stock, was allowed as a nontrade or nonbusiness expense.

Section 121 of the 1942 Act provides for the allowance of:

all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

The legislative reports state that the expenses "must bear a reasonable and proximate relation to the production or collection of income, or to the management, conservation, or maintenance of property held for that purpose." Report of Committee on Ways and Means, No. 2333, p. 75. and Report of Committee on Finance, No. 1683, p. 88.

The property taken and held by the trusts was income-producing property, and had been a part of the business assets of the Title Co. This was the property from the income of which the certificate holders had received the interest on their investments. This was the property, and perhaps the only property, from which they could hope again to receive interest and a return of their principal investment, depending upon the proper and businesslike management of the trusts and the properties. This was the property from which they did receive income in the taxable years. The expenses were not incurred to determine title, but were incurred to procure and set up an instrumentality for the "management." the "conservation." and the "maintenance" of the property, and the liquidation "in an orderly and businesslike manner, having due regard to the present depressed condition of the real estate market." The trusts were liquidating trusts and it was the duty of the trustees to postpone disposal of the properties until better prices could be obtained and meanwhile to see that the properties produced income. The expenses of the trusts bore a reasonable and proximate relation to the management, conservation, or maintenance of property held for the production of income. Therefore, series Q trustees are entitled to the deduction in the year ended October 31, 1936, of attorney fees of $28.881.34, accounting fees of $3,000, fees for the assignment of mortgages of $3,039.55, and stationery and printing expense of $2.209.59, and series F-1 trustees are entitled to the deduction in the year 1936 of attorney fees of $115,788.55 and accounting fees of $11,898.30, as nontrade or nonbusiness expenses.

(b) The petitioners further contend that they are entitled to deductions for depreciation. In the absence of a provision in the trust instrument authorizing and directing the trustees to keep the trust corpus intact the trust is not entitled to a deduction for depreciation. *Spalding Trust*, 34 B. T. A. 762; *Annie Louise Van Aken*, 35 B. T. A. 151. 162. Upon the application of the trustees of series F-1 for instructions as to methods of treating receipts and disbursements, the court in *In re New York Title & Mortgage Co.*, 297 N. Y. S. 405; 163 Misc. 333, said:

In the absence of a specific provision on the subject in the trust indenture, the trustees should not create a reserve for depreciation or withhold any moneys from distribution on the basis of such a theoretical reserve. The indentures contemplate that certificate holders will ultimately receive all of the funds

coming into the hands of the trustees by way of principal or interest and there is therefore no need or justification for a depreciation reserve—the trusts being liquidating in nature.

Since the trust instruments have no provision authorizing the trustees to withhold amounts for depreciation, the petitioners are not entitled to any deduction for depreciation.

In summary, the petitioners are held to be taxable; are not free from tax by reason of section 166, 167, or 162; the Commissioner is sustained in determining that petitioners are taxable upon the undistributed income of the trusts; the petitioners are entitled to deductions of the amounts paid in the respective years for attorney fees, accounting fees, mortgage assignment fees, and expenses for stationery and printing, and are not entitled to any deduction for depreciation.

*Decision will be entered under Rule 50.*